**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL ASSOCIATON OF THE DEAF, *et al.*,<br><br>          Plaintiffs,<br><br>    v.<br><br>DISTRICT HOSPITAL PARTNERS, L.P., d/b/a THE GEORGE WASHINGTON UNIVERSITY HOSPITAL<br><br>        Defendant. | Civil Action No. 1:14-cv-01122-RC |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION
TO STRIKE IRENE BOWEN AS DEFENDANT'S EXPERT WITNESS**

When an expert witness offers "testimony that consists of legal conclusion," the testimony typically is not admissible, *see Burkhart v. Washington Metropolitan Area Transit Authority*, 112 F.3d 1207, 1212 (D.C. Cir. 1997).  The exception to this rule of exclusion arises only "in cases that involve highly technical legal issues," *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011), which this case does not.  It follows that because Irene Bowen's report consists exclusively of legal background, legal analysis, and a legal conclusion, it should be stricken and her testimony should not be permitted.

**A.      Courts Typically Exclude Testimony That Consists Of Legal Conclusions.**

The United States Court of Appeals for the District of Columbia has held that "[e]xpert testimony that consists of legal conclusions cannot properly assist the trier of fact . . . , and thus it is not 'otherwise admissible.'"  *Burkhart*, 112 F.3d at 1212.  While this may be an exception to the typical rule of favoring the admissibility of expert testimony, courts within this jurisdiction and elsewhere routinely exclude expert testimony that "consists of legal conclusions."  *See, e.g.*, *Burkhart*, 112 F.3d at 1212-14 (holding that the district court abused its discretion by admitting

the report of plaintiff's  expert witness to opine what the ADA required and that defendant had

failed to comply); *Cordoves v. Miami-Dade Cnty.*, No. 14-20114-CIV, 2015 WL 2258457, at

*12 (S.D. Fla. Mar. 2, 2015) (rejecting an expert report as legal because "not only does it tell the

jury what result to reach, but it also is couched almost entirely in the language of the applicable

regulations"); *Convertino v. U.S. Dep't of Justice*, 772 F. Supp. 2d 10, 13-14 (D.D.C. 2010);

*Iacangelo v. Georgetown Univ.*, 560 F. Supp. 2d 53, 59 (D.D.C. 2008) adhered to, No. CIV.A.

05-2086 PLF, 2010 WL 4807082 (D.D.C. Nov. 19, 2010) ("In attempting to use legal experts to

prove that liability and causation have been established and to interpret statutory language,

Plaintiffs would effectively usurp the function of the trier of fact in this case."); *Halcomb v.*

*Washington Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 27 (D.D.C. 2007) ("Mr. Mazzei may

not testify as to the intent required to violate D.C. Code § 35-216 (2001), the statute which

plaintiff allegedly violated, nor may he opine as to whether plaintiff actually did violate the

statute."); *U.S. ex rel. Mossey v. Pal-Tech, Inc.*, 231 F. Supp. 2d 94, 98 (D.D.C. 2002) (rejecting

the report of an expert whose report uses a number of terms that "have specific meanings with

respect to contract interpretation, and these meanings are invoked by [the expert] in reaching

what necessarily must be viewed as legal conclusions").

Within the general rule of *excluding* testimony "on the ground that it gives legal

conclusions," courts recognize an exception "in cases that involve highly technical legal issues."

*United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011).  This is not such a case.  As illustrated

by the Defendant's own citations, "highly technical legal issues" refer to such matters as

securities litigation, *see, e.g.*, *Offill*, 666 F.3d at 175 (admitting legal testimony because "[t]he

jury in this case needed to understand not only federal securities registration requirements but

also the operation of several obscure Texas Code provisions and their relationship with the

federal regime."); *United States v. Bilzerian*, 926 F.3d 1285, 1294-95, proximate causation in

insurance law, *see, e.g.*, *Peckham v. Cont'l Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir. 1990), and

standards of care in the pharmaceutical industry, *Yasmin and Yaz Marketing Sales Practice and

Products Liability Litigation*, No. 3:09-MD-02100-DRH, 2011 WL 6302287, at *1 (S.D. Ill.

Dec. 16, 2011) (admitting testimony addressing whether Bayer misrepresented or omitted facts

to the Food and Drug Administration regarding "the safety of DRSP-containing COCs and

whether DRSP use is associated with a higher risk of VTE disease.").

 Neither the facts nor the proposed expert in this case are similar to the facts or expert in

*Brooklyn Center for Independence of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588 (S.D.N.Y.

2013), relied upon by defendant.  *Brooklyn Center* involved highly complex facts and an expert

witness who had expertise well beyond that of one who is simply trained as a lawyer.  In

*Brooklyn Center* a class of plaintiffs comprising "all people with disabilities . . . who are within

[New York] City and the jurisdiction served by the City's emergency preparedness programs and

services" sued for access to New York City's entire emergency preparedness program.  980 F.

Supp. 2d 596.  The class included individuals with disabilities affecting mobility, *see id.* at 602,

604; cognition, *see id.* at 617; psychiatric functioning, *see id.* at 598; sensory functioning, *see id.*

at 617-18; and individuals with significant medical needs, *see id.* at 620; and addressed their

needs in building evacuations (both high-rise and generally), *see id.* at 602; transportation, *see id.*

at 604; evacuation and transportation of homebound individuals, *see id.* at 606; the shelter

system and sheltering in place, *see id.* at 613 (including architectural and programmatic access,

*see id.* at 614, 617); power outages, *see id.* at 624; recovery operations, *see id.* at 626 (including

resource provision, *see id.* at 626; debris removal, *see id.* at 627; and interim housing, *see id.* at

628); education and outreach, *see id.* at 629; communications through multiple kinds of media,

*see id.* at 630-639; and the content of this communication, *see id.* at 637.  To resolve the case, the court had to determine whether and to what extent each person with a given type of disability did or did not have full and equal access to each type of emergency service.  *See id.*

Plaintiffs' expert witness in *Brooklyn Center*, Dr. Peter Blanck, is a lawyer but more importantly earned a Ph.D. in psychology and conducted extensive research on the needs of people with disabilities in disaster relief.  *See* Declaration of Dr. Peter Blanck, Ph.D., J.D., in Support of Plaintiffs' Motion for Class Certification, *Brooklyn Center for Independence of the Disabled*, 2012 WL 11838678, No. 11-civ-06690(JMF) (Aug. 31, 2012) ("Blanck Decl."). Ex. 1.  In 1995, Professor Blanck published research into disaster planning for people with disabilities that was "cited in reports by the U.S. federal agencies such as the Departments of Homeland Security, and Health and Human Services, and by the National Council on Disability."  *Id.* ¶ 8.  Following Hurricane Katrina, he partnered with the Employment and Training Administration to "(1) evaluate the effectiveness of DPNs in assisting people with disabilities in the region; (2) chronicle the experiences of people with disabilities on the Gulf Coast after Hurricane Katrina; (3) determine the extent to which federal, state, and local emergency preparedness policies and procedures adequately served the needs of people with disabilities; and (4) examine the DPN-HI program and lessons that may be applied to future disasters and in development of emergency preparedness policies related to people with disabilities."  *Id.* ¶ 11.

Thus, Dr. Blanck's testimony reflected decades of factual research into the experience of people with all kinds of disabilities in disaster scenarios.  Dr. Blanck's testimony, therefore, could assist the trier of fact in understanding the needs of each person with each type of disability in relation to each type of emergency service – a perspective that neither laypersons

nor lawyers typically offer.  Professor Blanck did not usurp the functions of a judge by testifying about whether a policy complied with a particular legal standard; he provided valuable factual testimony that aided the trier of fact in understanding the case.

In contrast to Professor Blanck, Ms. Bowen's only advanced degree is a J.D.  Ex. 2, Bowen CV.  Her career consists of litigation and policy work.  *See id.*  Her publications consist of descriptions of what she claims the ADA requires.  See Ex. 3, Bowen Publications.  And, most importantly, unlike Professor Blanck's Declaration, Bowen's proposed testimony would intrude on the jury's function.  Therefore, Plaintiffs' Motion should be granted.

### B.     The Sole Purpose Of Bowen's Report Is To Evaluate Defendant's Legal Compliance.

Because the sole purpose of Bowen's expert report is to evaluate whether Defendant complied with the ADA's and Rehabilitation Act's legal requirements, it and testimony based on it are inadmissible.  In *Burkhart*, the United States Court of Appeals for the District of Columbia articulated criteria for determining when a proposed expert's testimony is a legal conclusion and inadmissible.  The appeals court explained that "an expert may offer his opinion as to *facts* that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to *whether* the legal standard has been satisfied."  112 F.3d at 1212-13 (emphasis added).  The appeals court concluded in determining whether a report contains inadmissible legal conclusions or admissible assistance to the trier of fact that "[t]he best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.  If they do, exclusion is appropriate."  *Id.* at 1212.  One telltale sign that an expert report offers inadmissible legal conclusions is that the report "track[s] the language of the applicable statute," using terms

that "ha[ve] a specialized legal meaning that is more precise than the lay understanding of the

term." *Id.* (quoting *Torres v. County of Oakland*, 758 F.2d 147, 151 (6th Cir.1985)).

Bowen's report falls squarely in the category of legal opinion testimony because it

focuses solely on the question of whether the legal standard (*i.e.*, the ADA) has been satisfied.

In its own Opposition to Plaintiffs' Motion, Defendant describes Bowen as "an expert in the

ADA and its requirements regarding effective communication." Def.'s Br. at 2.  According to

Bowen, she "was asked to review the policies and practices of GWUH with respect to

communication for individuals who are deaf or hard of hearing, especially the use of video

remote interpreting (VRI), and to evaluate whether these were compliant with the applicable

statutory and regulatory requirements under Title III of the Americans with Disabilities Act and

section 504 of the Rehabilitation Act."  Ex. 4, Bowen Report at 1-2 (citations omitted).  She

hewed to this duty, in part by declining to apply "best practices and guidances from non-profit or

other private [non-governmental] groups" such as "the Registry of Interpreters for the Deaf and

the Joint Commission [on Accreditation of Healthcare Organizations" because "[t]hey are not

geared to, and should not be interpreted as, stating what is necessary for compliance with federal

statutes."  *Id.* at 4-5.

As noted above, Bowen's expertise is in the area of legal compliance only.  She has

worked as a litigator, and a policy advisor and consultant.  Ex. 2, Bowen CV.  Her publications

all center on explaining the ADA and what ADA compliance entails.  Ex. 3, Bowen Publications.

Her CV and publications reference no factual research to contribute to her understanding of what

the law requires:  she published no research on deaf individuals' communication needs or on

communication in medical settings, and she has never worked as a provider of auxiliary aids or

services in the healthcare setting or elsewhere.  Her only expertise is in the area of law, the traditional function of parties' counsel and of judges.

Defendant lists areas of Bowen's proposed testimony, which it claims are not legal conclusions, but which in fact highlight the improper nature of the testimony.  Bowen proposes to testify about:  her experience with the development of 28 C.F.R. § 36.303; how the DOJ has enforced this regulation with respect to hospitals and video remote interpreters (VRI); and her understanding of the history of communication technology for the deaf and hard of hearing (albeit without experience as a provider or consumer of such services).  According to the Defendant, this content appears exclusively on pages 5 and 15 of Bowen's Report.  *See* Def.'s Mot. at 5-6.  Thus, even if this particular testimony were not objectionable, this is not a situation in which objectionable testimony exists within a larger body of otherwise unobjectionable testimony from which a fact finder could draw the same conclusions that the witness did.  *See United States v. Duncan*, 42 F.3d 97, 100 (2d Cir. 1994).  Rather, Bowen's report offers a large body of objectionable testimony.  Indeed, her proposed testimony amounts to nothing but legal work that if needed should be done through the familiar tools of reading notices of proposed rulemaking, materials relating to the adoption of final rules, and litigation and administrative proceedings results.

### C.     This Case Does Not Involve A "Highly Technical" Legal Framework And Does Not Require A Legal Expert.

This case is much simpler than securities litigation or pharmaceutical torts.  This is a civil rights case about plaintiffs with one type of disability in one type of setting:  deaf patients in a hospital.  The questions are simple:  did Defendant provide effective communication?  if not, did its failure amount to deliberate indifference?  The entire regulatory scheme at issue is articulated in 28 C.F.R. § 36.303 ("Auxiliary aids and services").  Bowen does nothing that defense counsel

could not do:  she simply quotes existing DOJ materials and applies it favorably to the

Defendant's version of events, much in the style of a legal brief.  *See* Bowen Report at 15-16.

   Bowen's report belies how little she contributes to the case beyond the gravitas of her

own résumé, and underscores how this case does not require a legal expert.  Bowen's "vast

experience" in this area of law, *see* Def.'s Br. at 2, manifests in a form bearing striking similarity

to a legal brief:  she recites the contents of a single section of the Code of Federal Regulations,

see Ex. 4, Bowen Report at 5-6, 15 (quoting 28 C.F.R. § 36.303); she quotes the Federal

Register, see Bowen Report at 15-16; and she lists a handful of DOJ Settlement Agreements, see

Bowen Report at 16.  All of this information is publically available and typically conveyed by

attorneys in briefing.  Given that Bowen's explanation and analysis took up only a few pages, it

is unclear why Defendant's counsel could not accomplish this himself.

   It is also unclear what factual information Bowen offers that Defendant could not present

through its own Director of Patient Experience, Ms. Keisha Mullings-Smith.  Bowen's

"analysis" of Defendant's policies relies exclusively on emails and other representations by

Mullings-Smith.  See Ex. 4, Bowen Report at 7 (giving Mullings-Smith's overall

characterization of GWUH's communication policy); *id.* at 8 (paraphrasing Mullings-Smith's

explanation of how the Patient Experience Team responds upon learning that a deaf or hard of

hearing patient is on site); *id.* (paraphrasing Mullings-Smith's account of staff not following the

policy); *id.* (quoting an email from Mullings-Smith explaining the policy to unnamed providers);

*id.* at 9 (paraphrasing Mullings-Smith's explanation of when GWUH provides on-site

interpreters); *id.* (quoting an email from Mullings-Smith explaining when GWUH provides on-

site interpreters); *id.* at 10 (parroting Mullings-Smith's account of the source of GWUH's

information on when to use on-site interpreters versus VRI); *id.* (parroting Mullings-Smith's

account of how many VRI machines GWUH has); *id.* (quoting an email from Mullings-Smith articulating GWUH's legal obligations); *id.* at 11 (recounting Mullings-Smith's recitation of whether GWUH provides interpreters for companions); *id.* (quoting Mullings-Smith's account of when GWUH uses family members as interpreters); *id.* (quoting an email from Mullings-Smith articulating GWUH's legal obligations); *id.* at 13 (recounting her observation of Mullings-Smith operating the VRI machine in a conference room); *id.* (paraphrasing Mullings-Smith's account of how GWUH handles technical problems with the VRI machine); *id.* at 14 (recounting Mullings-Smith's account of the problem of how VRI machine time-outs had been handled).

Bowen adds nothing to Mullings-Smith's recitation of facts. Bowen conducted no interviews or observations of Defendant's employees to determine how they applied these policies day to day, nor did she interview or observe Defendant's patients to determine their experience with these policies. Further, although Bowen summarizes Defendant's policies, the policies are written in plain English. As the Director of Patient Experience and Bowen's primary source of information, Mullings-Smith is the proper witness to explain these policies to the finder of fact, *sans* legal conclusions.

Bowen likewise adds nothing of value as to the Defendant's use of VRI. To "assess" whether Defendant's VRI machine complies with federal regulations, Bowen relied solely on a demonstration of the machine in a conference room by Mullings-Smith. Ex. 4, Bowen Report at 13. Bowen did not observe the VRI machine in a medical care setting. *See id.* ("We were not in a medical care setting but rather in a conference room."). Bowen did not observe even a simulation of how the machine may actually be used during patient care. *See id.* ("We observed that the camera on the monitor is movable, and the WOW can be raised and lowered, although we did not work with positioning the camera separately from the monitor, stabilizing it, etc. . . . .

[My business partner] signed two sentences and the interpreter immediately voiced his signs correctly.").  And Bowen conducted no independent inquiry into how often the VRI machine malfunctions and how such malfunctioning is handled – a central issue in this case.  *Id.*  Instead, Bowen limited her observations to lay information:  the size and appearance of the VRI machine, how quickly it connected to an interpreter, how efficiently Mullings-Smith operated the system, her ability to see the interpreter, the interpreter's ability to see her, and their mutual ability to hear and understand one another during a two-sentence exchange.  *Id.*  She asked Mullings-Smith questions about VRI malfunctioning and how GWUH handled it, then accepted her answers as fact.  *See id.* (paraphrasing Mullings-Smith's account of how GWUH handles technical problems with the VRI machine); *id.* at 14 (recounting Mullings-Smith's account of how the problem of VRI machine time-outs had been handled).  Bowen's report indicates no independent knowledge as to how VRI works and does not discuss whether she knows anything about the communication needs of deaf and hard of hearing individuals in general, must less during surgery, childbirth, or emergent care.

In short, all Bowen adds to the case is the false imprimatur of the DOJ and work that is better characterized as that of co-counsel, not an expert.

## <u>CONCLUSION</u>

For the foregoing reasons, as well as those in Plaintiffs' original Motion and Memorandum, this Court should grant Plaintiffs' Motion to strike Irene Bowen as an expert witness.

Respectfully submitted,


/s/ Joseph Espo
Joseph B. Espo, Fed. Bar No. 429699
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland  21202
T:  (410) 962-1030
F:  (410) 385-0869
jbe@browngold.com

Debra Patkin
Caroline Jackson
NATIONAL ASSOCIATION OF THE DEAF
LAW AND ADVOCACY CENTER
8630 Fenton Street, Suite 820
Silver Spring, Maryland  20910
T:  (301) 587-7466
F:  (301) 587-1791
debra.patkin@nad.org
caroline.jackson@nad.org

*Attorneys for Plaintiffs*

Dated:  October 13, 2015

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 13th day of October, 2015 a copy of the foregoing

Plaintiffs' Reply in Support of Their Motion to Strike Irene Bowen as Defendant's Expert

Witness was delivered, by the court's e-filing system to:

    Christopher E. Hassell
    Bonner Kiernan Trebach & Crociata
    1233 20th Street, NW, Suite 800
    Washington, DC 20036
    chassell@bonnerkiernan.com

    *Attorneys for the Defendant*

                         /s/ Joseph B. Espo
                         Joseph B. Espo