# EXHIBIT 4



*Your ONE Source for ADA Guidance*

**EXPERT REPORT OF L. IRENE BOWEN**

*National Association of the Deaf, et al.,*
*v.*
*District Hospital Partners, L.P., d/b/a The George Washington University Hospital*
Civil Action No. 1:14-cv-01122-RC

## Contents

I.   Purpose ............................................................................................................................. 1
II.  Qualifications ................................................................................................................... 2
III. Summary ........................................................................................................................... 3
IV.  Information sources and disclaimer ............................................................................ 3
V.   Background and approach to analysis ........................................................................ 4
VI.  Facts ................................................................................................................................... 7
VII. Assessment and opinions ............................................................................................ 11
VIII. Conclusion .................................................................................................................... 15
Appendix A: Summary of work related to health care and to sign language interpreters ......
Appendix B: Publications, speeches, and training .................................................................
Appendix C: Documents reviewed ..........................................................................................
Attachment 1: Resume ..............................................................................................................

## I. Purpose

I was engaged to provide expert consulting services to the law firm of Bonner Kiernan, which represents George Washington University Hospital (GWUH or Hospital) in this litigation. I was asked to review the policies and practices of GWUH with respect to communication for individuals who are deaf or hard of hearing, especially the use of video remote interpreting (VRI), and to evaluate whether these were compliant with the applicable statutory and regulatory requirements under Title

Irene Bowen, J.D.  
Larry J. Goldberg, J.D  
*Partners*

9 Montvale Court, Silver Spring, MD 20904  
Office: 301.879.4542  Fax: 301.236.0754  Website: http://ADA-One.com  
Email: LarryGoldberg@ADA-One.com   IreneBowen@ADA-One.com

III of the Americans with Disabilities Act (ADA), 42 U.S.C. sections 12181, et seq., and section 504 of the Rehabilitation Act of 1973 (section 504), as amended, 29 U.S.C. section 794.

## II.  Qualifications

I am the founder and President of ADA One, LLC, a consulting firm focusing on advising state, local, federal, and private entities about compliance with the ADA and related laws. The firm grew from my thirty years of experience implementing the ADA, section 504, and the Architectural Barriers Act at the U. S. Department of Justice (DOJ) and the U.S. Access Board.

After serving as Deputy General Counsel for the U.S. Access Board, I coordinated federal efforts under section 504 at DOJ for almost ten years, until and after the passage of the ADA in 1990. As Deputy Chief of the Disability Rights Section of DOJ's Civil Rights Division (serving from 1990 to 2008), I was a member of the five-person task force that drafted DOJ's proposed and final 1991 ADA regulations. I was also actively involved in drafting the proposed revisions to the ADA regulations (issued in 2008), which were eventually issued with changes as the 2010 regulations (after I left DOJ). I regularly trained and presented about the regulations issued by DOJ and other agencies under section 504 and the ADA. At DOJ, among many other projects, I spearheaded initiatives in effective communication and health care and oversaw and conducted litigation, investigations, mediations, and settlements of ADA cases.

I supervised the first litigation brought against a hospital by DOJ about VRI and other communication issues, *Gillespie and U.S. v. Dimensions Health Corporation* (Laurel Regional Hospital), on which the 2010 DOJ regulations' requirements about VRI are largely based.

Since 2009, I have advised numerous public and private entities about compliance with the ADA and section 504, including a federal agency, the City of Chicago and the County of Fulton (Georgia), and three health care providers. I have been or am currently the principal or contributing author of five ADA guides, including one on communication with post-secondary students who are deaf or hard of hearing. I speak and train frequently about the ADA and section 504 and am an active board member of the National Association of ADA Coordinators, serving public entity ADA coordinators nationwide.

Many years ago, I was a co-founder and student director of the National Center for Law and Deafness, and in that capacity I trained police departments and other entities regarding the use of interpreter services, and educated people who were deaf or hard of hearing about their legal rights.

My qualifications are detailed in the attached resume (Attachment 1), summary of work related to health care and to sign language interpreters (Appendix A), and list of publications, speeches, and training (Appendix B).

I performed this work at the hourly fee of $450 per hour. Additional work on this matter would be billed at the same rate.

I have not testified as an expert witness in the last four years.

## III. Summary

GWUH has a policy of ensuring effective communication for patients and visitors who are deaf or hard of hearing, including through the provision of interpreters, either on site (face-to-face) or through VRI. VRI uses videoconferencing technology to link to a sign language interpreter who is in a location (a type of call center) separate from the individual who is deaf or hard of hearing. The interpreter appears on a screen (at GWUH, on a computer on a "workstation on wheels" or WOW) in real time and can see those at the Hospital via a mobile camera attached to the computer. Specifically as to the use of VRI vs. face-to-face interpreters, GWUH (1) deems VRI as its primary means of providing interpreters and (2) obtains face-to-face interpreters for situations that it has determined are not appropriate for VRI, such as labor and delivery, where a person who is deaf or hard of hearing cannot use VRI, or where an alternative form of communication is clinically indicated.

Nothing in the ADA and its implementing regulations prohibits a health care provider from using VRI as the prime means of providing sign language interpreting. Properly implemented, the current policy as a whole, as articulated to management on June 13, 2013, July 24, 2013, and December 18, 2014, and as conveyed to staff, meets the requirements of title III of the ADA and of section 504. It is founded in the principles of effective communication as set out in the relevant statutes, regulations, and federal guidance and is intended to ensure that interpreters are not just qualified (as required by the regulation) but certified, and that they are available in a timely manner.

## IV. Information sources and disclaimer

In providing this assessment, I reviewed documents provided by defendant's attorneys, including the Complaint; the reports of Plaintiffs' two expert witnesses Roger Williams and Marvis Scott; the deposition of Nathan Read, GWUH IT Department, re: VRI technical issues; position and priority statements issued by the National Association of the Deaf; the parties' responses to interrogatories; and a series of GWUH documents, including hospital patient guides, internal policies, training materials, online registration program information, and VRI instructions; email correspondence; service agreements, guides, contracts and related documents in connection with GWUH's VRI and sign language interpreter providers; information about GWUH's usage and costs associated with VRI and interpreter services for a period of time; and correspondence with DOJ. I also interviewed Keisha

Mullings-Smith, Director, Patient Experience, GWUH, and observed a demonstration of GWUH's process for linking to a VRI service provider.

I did not review the medical records of the three individual plaintiffs or evaluate the details about their treatment at GWUH, focusing instead on the Hospital's policies and practices, as articulated in the documents reviewed and the interview with Keisha Mullings-Smith.

A list of the documents reviewed is in Appendix C.

The findings and opinions in this report are expressed within a reasonable degree of certainty and are based on my experience, knowledge, and education, and the information provided to me. As I examine additional materials and perform further analyses, I reserve the right to revise and supplement my opinions.

This report was prepared to assist GWUH in this litigation. However, the report reflects my independent conclusions. Payment for my report was not contingent on my findings.

## V.   Background and approach to analysis

An understanding of all the federal requirements of effective communication, and the way in which DOJ has come to apply them to VRI in particular in the last several years, is critical to the determination of whether GWUH's approach to communication meets the ADA's requirements.

I reviewed applicable and relevant authorities with respect to the provision of effective communication, including through on-site sign language interpreters and VRI. I evaluated GWUH's policy primarily vis-à-vis the requirements of the ADA as reflected in the statute and DOJ's regulations (issued in 1991 and amended in 2010), which are binding and generally enforceable. I also considered the guidance that DOJ has issued in the regulations' preamble and the Department's technical assistance materials, which explain DOJ's expectations and interpretation of the statute and regulations. In addition, I reviewed DOJ settlement agreements and consent decrees with health care providers, as posted at www.ada.gov, the web site of the Disability Rights Section of the Civil Rights Division.

I did not separately analyze the GWUH policy for compliance with a funding agency's regulations under section 504 (here, those of the Department of Health and Human Services (HHS), 45 CFR part 84), because the two statutes are to be interpreted consistently, and the DOJ provisions are more detailed and current than those of the HHS regulations.

Although best practices and guidance from non-profit or other private groups are instructive, they are not binding and often go beyond the requirements of the regulation. They are not geared to, and should not be interpreted as, stating what is necessary for compliance with federal statutes.

Therefore, while I am aware of the content of the guidance, position papers, and best practices enunciated by the National Association of the Deaf (NAD), the Registry of Interpreters for the Deaf (RID), and the Joint Commission, for example, I did not use these as a measure of compliance.

I considered all the ADA requirements pertaining to effective communication and auxiliary aids and services, not just those related to the use of VRI, as explained next.

Fundamentally, the statute defines discrimination against people with disabilities to include the failure to provide "auxiliary aids and services."[1] Implementing this statutory provision, the title III regulation requires that a public accommodation ensure <u>effective communication</u> with individuals with disabilities. This includes the obligation to provide auxiliary aids that are appropriate for the individual and the particular situation, when necessary to ensure nondiscrimination. Auxiliary aids include qualified interpreters (on-site or through VRI), written materials, open and closed captioning such as real-time captioning, or other effective means of making aurally delivered information available to individuals who are deaf or hard of hearing. See title III regulation, 28 CFR 36.303.

The 1991 DOJ regulation for title III did not address video remote interpreting because at the time the technology did not exist (there was no internet), and only "live" or "face-to-face" interpreters were available. However, in the 2000s, several developments converged: because of the ADA, more services and activities were available to people with disabilities on a nondiscriminatory basis, people with disabilities began to assert their rights more vigorously, the increasing demand for interpreters led to a shortage of them in some areas, and the technology for VRI became available. Hospitals in particular began using VRI, especially for emergencies, in part because they could obtain interpreters more quickly.

While I was at DOJ, I led an investigation into use of VRI as a means of communication by Laurel Regional Hospital, which led to litigation and a consent decree in *Gillespie and U.S. v. Dimensions Health Corporation* in 2006. That consent decree was the first DOJ agreement to address VRI and it required the Hospital to meet certain performance standards related to video and audio quality, size and quality of the picture, clear transmission of voices, and training.

In 2010, when DOJ amended its title III regulation to reflect its experience with the statute, technological developments, and statutory changes, it included specific mandates to accommodate companions of those to whom services are directed and not to use family members as interpreters (with few exceptions). DOJ also added provisions about VRI: (1) VRI was added to the definition of auxiliary aids; (2) it was given as an example of auxiliary aids in the auxiliary aids and services section,

---

[1] Under title III of the ADA, a covered entity (such as a private health care provider) is relieved of this responsibility if it can demonstrate that providing the aid or service would result in an undue burden (significant difficulty or expense) or would fundamentally alter the nature of the services or accommodations offered. The "undue burden" and "fundamental alterations" provisions are not at issue here.

36.303; and (3) DOJ included system/performance requirements that are consistent with and more detailed than those developed in the Laurel litigation for VRI when it is used as an auxiliary aid. DOJ has not otherwise specifically included in the regulation any limitations on use of VRI or any criteria for choosing on-site vs. remote interpreters.

For this report, I identified GWUH's policy statements; the ways in which they have been conveyed to patients, staff, and associated providers; and the ways in which they are monitored and implemented. I reviewed the GWUH policy against eight regulatory requirements, as described in the next section. Although the determination of whether effective communication is provided is made on a case-by-case basis, my focus here was on GWUH's policy.

Eight regulatory requirements used for evaluation

1. Effective communication: Overall, the hospital must ensure effective communication with people with hearing disabilities.
2. Case-by-case choice: The choice of an auxiliary aid or service is made on a case-by-case basis. Factors include[2] --
    a. The method of communication used by the individual;
    b. The nature, length, and complexity of the communication involved; and
    c. The context in which the communication is taking place.
3. Consultation: The provider "should consult with the individual but the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication."
4. Qualified interpreters: An interpreter (face-to-face or remote) must be qualified (not necessarily certified).
5. VRI performance standards: If VRI is used, it must meet certain performance standards. (See section VII, pages 12-13, below.)
6. Timely and private: The auxiliary aid or service must be provided in a timely manner and in a way that protects the privacy and independence of the individual.
7. Companions: The provider must ensure effective communication with companions of an individual seeking access to services if that person is one with whom the public accommodation should communicate (e.g., a deaf parent of a hearing child who is a patient).
8. No family members as interpreters: The provider shall not require family members or companions to serve as interpreters, and may allow others to interpret in very limited, specific circumstances.

---

[2] These specific factors were added to the regulation in 2010.

## VI. Facts

The hospital's communication policy has been articulated in several ways, beginning in 1993, and most recently in an email from Keisha Mullings-Smith, Director of Patient Experience, to managers. Email from Ms. Mullings-Smith, Director, Patient Experience, GWUH, on December 18, 2014, to GWUH Management, Subject: Arranging Sign language Interpreting Services, GWU 001223-001225 (December 2014 email).

Ms. Mullings-Smith stated at her interview that the policy is rather vague, with a broad policy and general guidelines. Guidelines have been provided to management and staff, reviewed with staff in annual service excellence training, and posted on the intranet and on boards throughout the hospital. Specific information has been provided about obtaining both on-site and remote interpreters, and how to use VRI.

Based on various documents and Ms. Mullings-Smith's interview, I see the policy as having ten features. I have designated them by my own headings, underlined below. The language in italics is quoted or paraphrased from the GWUH policies.

1. Overall policy: *"Individuals with disabilities will be offered full access to all facilities and resources."* GW Standard Practice: Disabled Patients," September 1993 (SP 1993, reviewed April 2006; updated 2010 (Standard Practice), section II.B, GWU 01030).
2. Determining accommodations at initial contact: *"Attempts will be made by staff members during initial patient contact (Admitting office, Admitting pre-registration, the Preadmission Testing Unit, Emergency Unit registration, etc.) to determine what accommodations a patient will require."*[3] (Standard Practice, section II.B, GWU 01030.)

A patient who registers or schedules a service such as radiology, outpatient pain treatment, etc. on the GWUH website (through REGIE) finds an option on the first page to request a sign language interpreter through a drop-down menu. (See current screen shot, GWU 001229.) The individual can also register via phone or TTY and make a request at that time. An indication that a person uses an interpreter goes into his or her written chart but the information does not go into Cerner, the electronic medical records system.

3. Process for nursing staff to inform individuals of availability of assistance, process for obtaining assistance: *Upon arrival to the hospital, admitting, outpatient registration and/or nursing staff will inform hearing-impaired persons of the availability of assistance in communication. Arrangements for sign language interpreters, closed caption decoders and other devices and assistance are available. Arrangements can be made for in-patients and*

---

[3] "Resource sheets describing available resources are available to staff at all nursing stations, all outpatient registration areas, the Admitting Office and the Emergency Unit." Standard Practice, GWU 01030. A resource sheet entitled "Persons with Communication Disabilities," App. B, gives tips to improve communication. GWU 01031.

| L. Irene Bowen | Expert report of February 17, 2015 | Page 7 |

> *hospital based outpatients through unit staff, and during off shifts and weekends through the House Operations Supervisor (HOS). Should the patient request auxiliary aid in the form of either a sign language interpreter, closed caption decoder, or TDD, the Hospital will provide either or both, as reasonably available.[4]*
>
> *Requests for interpreters are made by contacting Customer Service (after hours and for emergencies, HOS). Where possible, 3 business days' notice is to be given.[5] Physicians making reservations or posting surgery will notify the Admitting Office, which will in turn notify the manager of the receiving unit.* (Standard Practice, GWU 00730, 00733.)

Ms. Mullings-Smith explained that when the Patient Experience Team is aware of a patient with a hearing impairment, it will visit the unit and make sure the staff knows about VRI. If a patient objects to VRI, the Patient Experience Team will explain the benefits of getting an interpreter in minutes vs. one to two hours and encourage the patient to try VRI. At the same time, if a nurse sees that a patient cannot communicate and, for example, has had surgery or for some reason cannot use VRI, the nurse will tell the charge nurse or next in command and an authorized person can obtain an on-site interpreter.

4. <u>Coordination of medical professionals and interpreter services for visits</u>: *A designated member of the Medical team shall work to coordinate all medical and allied health professionals to make patient visits during the hours the interpreter is present.[6]* Standard Practice, GW 00733.

5. <u>Effective communication for every encounter:</u> As recently restated by Keisha Mullings-Smith and, according to her, explained to providers in particular situations prior to that time: *"By law, we are **required** to provide interpreter accommodations to hearing impaired visitors and patients during every encounter of care… "* December 2014 email, GW 01223, emphasis in original.

Ms. Mullings-Smith said that there had been a few instances of staff or providers not understanding that VRI had to be used for every type of contact. For example, in pre-op (surgical services), where patients are in bays, staff would at times want to come in quickly just to do a procedure or check a patient's vitals and not want to have an interpreter or VRI involved. At times medical residents have not understood the need to use VRI. The Patient Experience Office explained that all staff needed to communicate with the patient, so VRI is necessary for each instance of communication or clinical involvement with the patient.

---

[4] The phrase "as reasonably available" was added in 2010.

[5] Other information that was deleted from the 1993/2006 version (in 2010) about family members and limiting services to 3 hours a day is noted below. See footnotes 6 and 9.

[6] In 2010, a statement that staff shall attempt to limit interpreter services to three hours per day was deleted.

6. <u>Two means of providing interpreters</u>:

Until 2013, GWUH had contracts with several vendors to provide both on-site (face-to-face) and video remote interpreter services. Then, in June 2013, VRI became the primary means of interpreter service, with LSA as the sole vendor (email from Jennifer Downs, June 13, 2013, re: New Vendor and Method for Providing Sign Language Interpreting Services, GWU 00168-00169); and a new vendor, SLUSA, became the new sole vendor for face-to-face interpreter services beginning August 1, 2013. Email from Jennifer Downs to GW Hospital Management, July 24, 2013, GWU 00182-00186.

   a. *"VRI service is the **primary method** for sign language interpretation <u>at GW Hospital</u>. Designated WOWs outfitted with cameras and speakers are stationed in clinical and registration areas. Absent a clinical indication, VRI should be utilized." Clinical indications include –*
      i. *Surgery*
      ii. *Labor and delivery*[7]
      iii. *Vision impairment*
      iv. *Etc.* December 2014 email, GWU 001223.

   b. *Face-to-face interpretation remains the primary source for sign language interpreting for off-site locations*[8] *[i.e., at satellite locations].* July 24, 2013 email, GWU 001224.

   c. *Live (face-to-face interpreter) at GW Hospital:*
      i. *In cases where a provider indicates a live interpreter, SLUSA should be contacted by an authorized hospital leader or Patient Experience.*
      ii. *Directors, managers, clinical supervisors, and HOS may authorize a live interpreter after an assessment of the patient's communication needs is completed.* Email from Keisha Mullings-Smith to Shana Paimient and Beverly Lavoie for staff, May 9, 2014, re: new vendor for face to face sign language interpreting. GWU 00325.

Ms. Mullings-Smith said in her interview that if someone wants an interpreter, it is automatic that a face-to-face interpreter will be provided for the instances listed under the clinical indications category, as well as for scheduled mammograms, physical therapy, radiation oncology appointments, and other procedures that preclude the use of VRI technology. In the event of a technical problem (intranet outage, electrical outage), a face-to-face interpreter would be used. The hospital has also

---

[7] Ms. Mullings-Smith's February 2014 emails to a patient also said that in certain instances, like labor and delivery, an on-site interpreter is more appropriate. She stated that an on-site interpreter would be provided for the patient, to be contacted upon her arrival; until an interpreter arrived, VRI would be used to complete registration. GWU 00206-207.

[8] I.e., at satellite locations, those outside the hospital building itself.

used VRI for pre-childbirth classes, but she said that it would be better to use an on-site interpreter for that type of class.

Ms. Mullings-Smith said that GWUH adheres to the guidelines of the vendor, LSA, as to when to use VRI vs. face-to-face interpreters. LSA says that VRI should be used for emergency situations, when there is a need to communicate with medical staff, for educational classes scheduled on short notice, for communicating with a visiting deaf family member, when a patient doesn't want to wait for a sign language interpreter, for cost-efficiency if an encounter is under 60 minutes (because VRI use is charged on a per-minute basis, vs. a two-hour minimum for face-to-face interpreters), for occupational and physical therapy sessions, and in the face of concerns about anonymity and the use of an interpreter from the local community. Guide to VRI, GWU 00002.

LSA considers face-to-face interpreters appropriate for instances involving the presence of a secondary disability (e.g., vision impairment) that impedes the ability to use VRI technology, highly sensitive communications (e.g., re: terminal illness), large training classes, patients not comfortable with new technology, medical appointments with small children, highly emotional situations (e.g., rape), mental health emergencies, and diagnostic testing (where VRI technology is not allowed). LSA Guide to VRI, GWU 00003.

It appears that in one respect, GWUH chooses face-to-face interpreters when LSA's guidelines would call for VRI. According to Ms. Mullings-Smith, GWUH generally chooses face-to-face interpreters over VRI for occupational and physical therapy sessions.

For VRI purposes, according to Ms. Mullings-Smith and Mr. Read, the Hospital has 13 workstations on wheels (WOWs) with computers used for VRI; these are also used for medical records, as are all the other WOWs. The WOWs used for VRI are clearly marked as such and have cameras attached to the top of the monitor. If a WOW is used for VRI, it does not leave the room. WOWs are assigned to certain areas, including the emergency department (two WOWs), the intensive care unit, 5 North, and 5 South. As of April 2014 all are Dell Octiplex 7010s computers; before that time, most were Dell Optiplex 160s and the others were 7010s. If VRI is needed in an area that does not have a designated WOW, one will be pulled by Patient Experience or HOS from another area that does not have a patient with a hearing disability. Rarely are more than two in use at once.

The Hospital uses other means of communication and interim measures, in addition to face-to-face or video interpreting. At times staff will write notes or use communication boards. There are about 20 different boards addressing different aspects of care, in various languages, including some with photos or graphics. These are on the WOW VRI machines and can be printed out when needed.

7. Documentation of efforts: As restated by Keisha Mullings-Smith in December 2014: *"By law, we are **required** to provide interpreter accommodations… and to document our efforts."* GWU 001223.

8. Ensures communication for persons accompanying patient – As recently restated by Keisha Mullings-Smith: *"By law, we are **required** to provide interpreter accommodations to hearing impaired visitors and patients during every encounter of care… "* (Bold emphasis in original, underlined emphasis added.)   December 2014 email, GWU 001223.

Ms. Mullings-Smith said that the hospital also provides VRI/on-site interpreters for companions, e.g., the deaf husband of a woman who is in labor and delivery, and that in that situation it would be an on-site interpreter.  GWUH provides interpreters for registration, tours, childbirth classes, etc.

9. GW prohibits the use of family members as interpreters.

Ms. Mullings-Smith said that GWUHP "absolutely discourages" family members from interpreting, due to issues about communication concerning the plan of care.  "Everyone in the organization knows not to do that."[9]

10. Notice and grievance procedure

The Patient Rights and Responsibilities brochure, also known as the Patient Bill of Rights (originally dated 2010 and updated in 2013, GWU 00009-00013), is given to patients on admission.  *It states the right to have language-interpreter services arranged by the Hospital, and the right to equal treatment on the basis of disability.  In the event that an individual feels he or she has been discriminated against, the brochure provided contact information for the Patient Hotline, the Ethics Committee, the DC Office of Human Rights, the DOJ Disability Rights Section, and the Joint Commission.  There is a Hospital Practice effective February 2013 (GWU 00015-20) that sets out the hospital-wide policy for processing patient complaints and grievances.*

## VII.   Assessment and opinions

Applying the eight regulatory requirements set out in section V above, it is my view that the Hospital's policy as a whole complies with the ADA when applied appropriately on a case-by-case basis.

Title III allows a hospital to choose from different methods of providing auxiliary aids and services -- whether the reasons relate to cost, efficiency, speed of obtaining auxiliary aids, quality of interpreters, or other considerations --  if effective communication is achieved.  Ms. Mullings-Smith explained that through VRI the hospital can obtain services more quickly; in the past, it would often take two to four hours to get an interpreter on site, especially in the middle of the night or during heavy traffic or weather conditions, and that VRI is instant.  When appropriate, this approach is more

---

[9] The 2010 version of the Standard Practice, GWU 00730, deleted the following statement, which had been in the 1993/2006 version: "When requesting interpreters, first find out if family members are available to help interpret."   GWU 00725.

cost-efficient as well, because there is no need to pay travel time or for a minimum amount of service time (e.g., with a two- hour minimum for on-site interpreters vs. by a per-minute charge for VRI).

1. Effective communication: GWUH has clearly stated its intention to provide effective communication.

2. Case-by-case choice: The policy takes into account the factors for making case-by-case decisions by (a) carving out certain situations in which the nature, complexity, or context of the communication will generally dictate use of an on-site interpreter (e.g., labor and delivery, surgery, clinical indications) and (b) using VRI as the prime means of providing interpreter services in other situations.

3. Consultation: The Standard Practice requires that attempts be made by staff members during initial patient contact (Admitting office, Admitting pre-registration, the Preadmission Testing Unit, Emergency Unit registration, etc.) to determine what accommodations a patient will require. Patients can indicate a request for an interpreter through REGIE or phone/TTY registration. Directors, managers, clinical supervisors, and HOS may authorize a live interpreter after an assessment of the patient's communication needs is completed.

4. Qualified interpreters: According to Ms. Mullings-Smith, through the Hospital's approach, GWUH is more likely to get interpreters who are not just qualified but certified.  (The regulations require that interpreters be qualified but not necessarily certified; however, certified interpreters are more likely to be qualified.)  At times before 2013, the hospital would be sent interpreters who were not certified but were only in the process of becoming certified; now they draw from a broader population of interpreters, all of whom are certified.

5. VRI Standards

The 2010 amendments to the DOJ title III regulation state:

> A public accommodation that chooses to provide qualified interpreters via VRI service shall ensure that it provides –
>
> (1) Real-time, full-motion video and audio over a dedicated high-speed, wide-bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication;
>
> (2) A sharply delineated image that is large enough to display the interpreter's face, arms, hands, and fingers, and the participating individual's face, arms, hands, and fingers, regardless of his or her body position;
>
> (3) A clear, audible transmission of voices; and

> (4) Adequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI.

28 CFR 36.303(f).

The demonstration of VRI at Ms. Mullings-Smith's interview, her description of the technology in place, and the deposition of Mr. Read lead me to conclude that the technology is geared to these requirements.

We observed that the equipment was clearly labeled for use as VRI and had a camera attached to the top of the monitor, with a 22" screen. Even though the computer had not been booted up, the desktop display appeared promptly when the equipment was turned on. Ms. Mullings-Smith clicked on an icon, entered the universal name and password from the label below the monitor, and attempted to connect through the test function. When there was a slight delay in connecting in that way, she connected directly to a remote interpreter rather than through the test function; this connection was almost immediate. The interpreter provided additional assistance in how to split the screen so that we could see both the interpreter and ourselves.

The quality of both the picture and the sound were good. The large screen allowed for splitting the view between the interpreter and those in the room and showed face, arms, hands, and fingers clearly. We observed that the camera on the monitor is movable, and the WOW can be raised and lowered, although we did not work with positioning the camera separately from the monitor, stabilizing it, etc. We were not in a medical care setting but rather in a conference room. Although the interpreter was not aware of it, my business partner, who was in the room, signs. He signed two sentences and the interpreter immediately voiced his signs correctly.

All staff were trained by LSA, the VRI vendor, shortly after staff was told of the new policy in June 2013, according to Ms. Mullings-Smith. This included live hands-on training and a demonstration of how the VRI equipment works, including the mechanics of the equipment, how to log on and use it, how to position the camera and adjust volumes and screen size. Antony Rai with LSA emailed afterwards to commend GWUH on the training. Email to Jennifer Downs, June 14, 2013, GWU00229. This training, based on information from the LSA VRI guide, is also given to new employees and included in an annual refresher in-service excellence training for each employee. The facilitator discusses when the use of VRI is appropriate. The LSA guide sets forth the applicable system requirements for the use of VRI, explains how to use LSA's request system, and sets out a series of best practices when using VRI as to placement of the equipment, interpreter, and patient; lighting; privacy; background information exchange; and pace of conversations. LSA guides, VRI location card, VRI user guide, GWU 00001-00008, 00351-00362. Both Mr. Read, GWUH's IT director, and Ms. Mullings-Smith have said that the equipment meets these standards.

Ms. Mullings-Smith said that if problems with the video or audio occur, which happens rarely, the Patient Experience Team will assess any problems and if they are technical ones, they will call IT (which has a designated person for this purpose, and a back-up). If the problems cannot be resolved quickly, GWUH will call in a face-to-face interpreter.

Ms. Mullings-Smith said that there had been some instances of the computer timing out when used for VRI. The WOWs, which are used to track patient care through electronic medical records, are programmed to time out after several minutes so that medical information is not inadvertently displayed on the screen for persons other than providers to see. She also said, however, that the staff has been trained to move the mouse every few minutes to prevent timing out.

6. Timely and private communication: It appears that the VRI services GWUH uses are quicker to put in place than on-site services; in fact, this is one reason given for ensuring availability of VRI and not just on-site interpreters. Ms. Mullings-Smith said that it usually takes 1 to 2 hours to obtain an on-site interpreter, and up to four hours during bad weather or heavy traffic. I have not reviewed any documents about the typical time between initial request and fulfillment of requests for sign language interpreters on site. I have observed that during our demonstration the connection with the VRI interpreter was almost instantaneous. I am not aware of any reason why VRI would be less private than an aural discussion or interaction with an on-site sign language interpreter. Therefore it appears that the requirements for timeliness and privacy are met by the VRI services that GWUH uses.

7. Effective communication with companions: GWUH policy, as stated in several places, is to ensure effective communication not just with patients but with visitors, during every encounter of care. (See numbers 1, 5, and 8 above in section VI, Facts.) Also as described in section VI.8, the hospital provides interpreters for deaf partners or family members of women in labor and delivery, tours, classes, etc.

8. No use of family members to interpret: In 2010, in accordance with the revised 2010 DOJ regulations, GWUH removed from its Standard Practice any mention of using family members as interpreters and appears to be in compliance with this requirement.


GWUH also has procedural safeguards in place, with a grievance procedure and means to file complaints and grievances set out in the Bill of Rights, grievance procedure, and Standard Practice. See section VI.10, above.

## VIII. Conclusion

The GWUH policy about interpreters and their provision either through on-site services or through VRI is consistent with the title III regulation.

Some best practices, guidelines, and advocates suggest that medical care providers should "default" to face-to-face interpreters, and that VRI should be used only in an emergency situation or as an interim measure while a face-to-face interpreter is on his or her way. Some also seek to require the provider to defer to the stated wishes of the person with a disability and to provide a face-to-face interpreter if the individual requests one, without allowing the provider to choose the means of communication.

Both suggestions are contrary to the language of the title III regulation and to DOJ's explanation of it and would limit the provider's ability to make an appropriate choice according to each situation and individual.

The title III regulation states that public accommodations "should consult" with individuals in order to determine what auxiliary aids are needed for effective communication. But "the ultimate decision as to what measures to take rests with the public accommodation, provided that the method chosen results in effective communication." 28 CFR 36.303(c)(1)(ii).

"Flipping" this approach (to require defaulting to live interpreters at the request of an individual) might perhaps be consistent in some instances with the principles of the title II regulation; but that regulation applies only to public entities (e.g., those that are part of a state or local government), and DOJ made a clear choice, as articulated in the title III regulation and analysis for both the 1991 and 2010 regulations, to set out a different approach for private entities (public accommodations) such as GWUH. In 2010 the Department noted that some commenters had urged that the 1991 regulation should be amended to require public accommodations to give "primary consideration to the expressed choice of an individual with a disability" (as required by title II) as to the type of auxiliary aid. DOJ explained that Congress did not intend to impose this obligation under title III and cited legislative history expressing an expectation that public accommodations consult with the individual before providing a particular auxiliary aid or service. Analysis of 36.303, *Determining appropriate auxiliary aids,* appendix to 1991 regulation, 28 CFR part 36, 75 Fed. Reg. 56282 (Sept. 15, 2010).[10] As DOJ had explained in the preamble/analysis for the 1991 regulation, "The auxiliary aid requirement is a flexible one. A public accommodation can choose among various alternatives as long as the result is effective communication." 56 Fed. Reg. 35566 (July 26, 1991).

---

[10] In fact, the level of effectiveness in communication required by title II is arguably higher than that required by title III. Title III mandates "effective communication," whereas title II requires that a public entity's communications with people with disabilities be "as effective as" communications with others. Title II regulation, 28 CFR 35.160(a)(1).

DOJ also responded to commenters who had requested more explicit guidelines for VRI as well as limitations on its use in medical situations. In light of the Department's own research and experience, it explained that VRI "can be an effective method of providing interpreting services" in "many situations involving routine medical care, as well as in the emergency room where urgent care is important, but no in-person care is available" (noting that it may not be effective for surgery, other medical procedures, and where the ability to seen the video screen is limited). 75 Fed. Reg. 56270 (Sept. 15, 2010) (explanation of *Video Remote Interpreting (VRI) services*). Instead of limiting the use of VRI or setting out guidelines beyond the four performance standards discussed, DOJ emphasized the flexibility of the "effective communication" requirement and strongly urged consultation in order to determine what aids and services are appropriate under the circumstances.

As explained above, GWUH's stated policy is consistent with the requirements of the title III regulation as well as the examples given in the DOJ analysis. It is also consistent with the policies found in DOJ settlement agreements with title III entities concerning use of VRI. For example, see DOJ consent decrees and settlement agreements with Dimensions Health Corporation, http://www.ada.gov/laurelco.htm#consent%20order (2006), Inova Health Care Services, http://www.ada.gov/inova_fallschurch.htm (no distinction between VRI and on-site interpreters and no limitations on use of VRI) (2007), Swedish Edmonds Hospital (10/10/14), http://www.ada.gov/swedish_edmonds_sa.htm , Associated Foot and Ankle Centers of Northern Virginia (10/9/14), http://www.ada.gov/afac_sa.htm , and Franciscan St. James Health (12/3/14), http://www.ada.gov/st_james_sa.htm .

As is true of any policy, whether the policy ensures effective communication will be determined when it is applied in individual situations.

L. Irene Bowen

Dated: _____

## Appendix A: Summary of work related to health care and to sign language interpreters

## Appendix B: Publications, speeches, and training

## Appendix C: Documents reviewed

## Attachment 1: Resume